# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-1919

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAY CHARLES JACKSON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 01 CR 476—**Charles P. Kocoras**, *Chief Judge*.

———————

ARGUED NOVEMBER 1, 2002—DECIDED NOVEMBER 13, 2002

———————

Before BAUER, POSNER, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Ray Charles Jackson does not believe in following laws, rules—or orders. Convicted in 1979 of selling forbidden drugs, he was sentenced to 15 years' imprisonment plus 25 years' special parole. This sentence, for a crime preceding the Sentencing Reform Act of 1984, carried the option of regular parole too, and the Parole Commission released Jackson in 1983. He did not stay out long, because he failed to report to his probation officer, failed to cooperate in drug testing, and otherwise scorned the conditions of his freedom. A cycle of release,

transgression, revocation, reimprisonment, and re-release was repeated six times between 1983 and 2000. In March 2000 the Parole Commission issued a warrant to start the process of revoking Jackson's parole a seventh time. The Marshal Service was responsible for executing the warrant.

Five deputy marshals went to Jackson's last known address. On learning that he was not there, they decided to wait. Jackson soon arrived, but he tried to flee when he learned that he would be taken into custody. A short auto chase ensued, with Jackson (pursued by vehicles with lights flashing and sirens blaring) running stop signs and red lights but returning to his starting point, where he was trapped by other cars. Jackson emerged from his car screaming obscenities at the deputy marshals. Told to put his hands over his head, he thrust them into his pockets instead. That was a threatening move, for the officers could not know what he might bring out. Jackson removed his car keys, and, again defying orders, plunged one hand back into his pocket. At this point the agents tackled him, so that he could not use whatever was there. (As it turned out, the pocket contained two knives.) One deputy marshal applied a sweep kick to force Jackson face down on the ground. Others piled on top of Jackson, who squirmed and twisted as hard as he could in an effort to roll under the car. Resistance was futile but did have one effect: Randy Scott, who tried to handcuff Jackson's hands behind his back, tore a ligament in his right thumb during the struggle. This required surgical repair. In response to Jackson's effort to impede the deputy marshals, the Parole Commission set a longer-than-normal wait until his next release, and the United States filed charges under 18 U.S.C. §111, which makes it a crime forcibly to resist a federal officer. Following conviction in a jury trial, Jackson was sentenced to 58 months' imprisonment.

According to Jackson, the evidence does not support the judgment. Jackson denies that he violated §111(a)(1), which

makes it a crime forcibly to resist, impede, or interfere with a federal law-enforcement officer. He believes that the evidence did not permit the jury to find that he acted "forcibly." That argument is frivolous; violation of §111(a)(1) has been established. But the maximum penalty under §111(a) is only 36 months' imprisonment. The higher sentence that Jackson received depends on §111(b), which provides:

> Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than ten years, or both.

Jackson insists that he did not "inflict" injury on Scott and that the verdict with respect to §111(b) is defective because the jury was not told that intent to injure is essential.

The latter argument runs smack into *United States v. Woody*, 55 F.3d 1257, 1265-67 (7th Cir. 1995), which holds that §111(b) does not require proof of intent to injure. *Woody* understood *United States v. Feola*, 420 U.S. 671 (1975), which held that the defendant need not know that the person being impeded is a federal (as opposed to state) officer, to establish the proposition that the only mental-state element in §111 is that the defendant intend to resist, impede, or obstruct a law-enforcement officer. Jackson asks us to overrule *Woody* on the ground that it preceded *Apprendi v. New Jersey*, 530 U.S. 466 (2000). *Woody* took §111(b) as a sentencing factor to be applied by the judge, while after *Apprendi* the circumstances that permit the higher penalty must be ascertained by the jury beyond a reasonable doubt. True enough, but what has this to do with *scienter*? *Apprendi* affects the who of decisionmaking (the choice between judge and jury) and the burden of persuasion (preponderance versus reasonable doubt) but does

not change *what* must be established to support a higher punishment. See *Curtis v. United States*, 294 F.3d 841, 843 (7th Cir. 2002) ("*Apprendi* does not alter which facts have what legal significance"). And there is nothing to be said for Jackson's position as an original matter. Section 111(b) raises the maximum punishment when a bad consequence ensues; this language does not state or suggest any mental element beyond what is required by §111(a). Jackson's lawyer conceded at oral argument that if during the auto chase Jackson's car had collided with one of the pursuers and left a deputy marshal confined to a wheelchair for life, then punishment could be enhanced under §111(b) even if Jackson's goal had been to avoid a crash (and thus enhance the chance of his escape). That settles the principle. It is a detail that deputy marshal Scott suffered a lesser injury, or that the force causing the injury came from a skirmish rather than a chase.

As for the question whether Jackson "inflicted" an injury on Scott: the jury was entitled to conclude that he did. Jackson contends that the word "inflict" means a deliberate plan to produce a consequence, and that an accidental harm is "caused" but not "inflicted." Sensible jurors could have concluded that Jackson *did* want to harm the deputy marshals. Escape was impossible once the officers' cars blocked Jackson's. What could have been the point of this skirmish other than a desire to hurt the captors? Jackson could not have foreseen the particular injury that occurred, but he could have foreseen (and may well have desired) that *some* harm would come to the deputy marshals. But there is a deeper problem: "inflict" does not require mentation. See *United States v. Garcia-Camacho*, 122 F.3d 1265, 1269 (9th Cir. 1997). Common phrases such as "the hurricane inflicted $100 million in damage" attest to this. Hurricanes, earthquakes, and other natural processes do not have minds, but they inflict big losses. Likewise Jackson inflicted Scott's injury no matter what was in Jackson's mind.

Doubtless "inflict" is more restrictive than "cause"; if Jackson had not resisted, but Scott had tripped on his untied shoelaces while walking over to apply handcuffs, it would not make sense to say that Jackson had "inflicted" an injury. But the actual injury occurred while Scott was grappling with Jackson, who applied force directly to Scott's person. This satisfies the normal understanding of "inflict."

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*